**The STATE of Utah, Plaintiff and Respondent,**

v.

**Darrell Keith BOOKER, Defendant and Appellant.**

**No. 18930.**

Supreme Court of Utah.

Oct. 25, 1985.

James Bradshaw, Salt Lake City, for defendant and appellant.

David L. Wilkinson, J. Stephen Mikita, Salt Lake City, for plaintiff and respondent.

ZIMMERMAN, Justice:

Defendant Darrell Keith Booker appeals from a conviction for aggravated sexual assault. U.C.A., 1953, § 76–5–405 (Supp. 1983). Booker questions the sufficiency of the evidence to support the conviction, the prejudicial effect of the prosecution's failure to provide Booker with certain testimony of the State's witnesses in advance of trial, and the failure of the trial court to give a cautionary *Telfaire*-type instruction regarding the eyewitness identification of Booker. We reject all challenges and affirm the conviction.

■ The pertinent facts are set forth in some detail because of Booker's claim of insufficiency of the evidence. On July 25, 1981, the victim returned to her apartment around 1:30 a.m. Her roommate was away for the weekend and no one else was present. She fell asleep at 2:00 a.m. Sometime thereafter, she was awakened by a young black man, who was standing naked at her bedroom door. As the perpetrator approached the bed, the victim stood up and attempted to push him out of her way and leave the room. The perpetrator threw her to the bedroom floor, sat on her, and placed a knife at her throat. After threatening her, he proceeded to rape her. Although there were no lights on in the apartment, she was able to describe him as 5′6″–5′8″ and 145–150 pounds, with close-cropped black hair and little body hair.

The victim testified that throughout the encounter the rapist talked constantly. When he threatened her, he said, "You know this is your knife, don't you?" The rapist also told her not to scream, to cooperate, and that if he had wanted to kill her he would have done so already. The rapist asked where her roommate had gone and said, "You know I have been watching you for a long time, don't you?" The victim replied "no," and then the rapist continued asking her questions for five to ten minutes more during the actual rape. He asked her if she had a boyfriend. When she replied "yes," he responded, "I knew you'd never go out with me, that you weren't the type of woman that would ever go out with someone dark." He asked her to stop crying, to "just pretend like you picked me—picked me up somewhere and brought me home." At one point, he asked, "You love your mommy and daddy, don't you?" He also told her that he knew

her name and that she worked at the nearby 24-hour grocery store.

The victim testified that at the conclusion of the physical act, the rapist's voice, which had been relatively quiet, became louder and more violent. For ten more minutes, he warned her not to call the police and said that he had been watching her and that his friends could bomb her apartment. He then pulled her up by the arm, held the knife in her back, and pushed her into the darkened bathroom. After a minute or two, he again entered the bathroom and threatened her. She remained in the bathroom for ten to fifteen minutes, checked the doors of her apartment, then turned on the lights, and called some friends. She made the calls around 4:00 a.m.

At about 5:00 a.m., after her friends had arrived, the victim received a phone call from a person whose voice she immediately recognized as the rapist's. He asked her, "What are you doing? Are you with the police?" and again warned her not to notify the police. He also claimed to be watching her. Several days later at approximately midnight, in the presence of friends, she received another call from the rapist, who said that he was calling to apologize. The next day, she called the police.

The victim worked as a checker in a 24-hour grocery store located about a block from her apartment. At the trial, she testified that on August 17th or 18th, about three weeks after the rape, she was working at the store. Around noon, Booker, a young black man, came through her checkout line. She saw him coming, thought that he resembled the rapist, and made an unsuccessful attempt to get him to speak. Later that afternoon, the same individual returned to her line. The victim testified that on this occasion, prior to any conversation with him, she thought she recognized him as the rapist and then remembered having conversed with him before at the store. When the man said "hello" and "thank you," the victim recognized the sound of his voice as the one she had heard on the night of the rape and in the telephone conversations. The victim testified

that she identified Booker primarily by the sound of his voice.

Other circumstantial evidence tended to link Booker to the crime. In her testimony, the victim recalled specifically that the rapist told her that she worked at the grocery store, that he had been watching her for a long time, and that he knew she would never go out with him. Three days prior to the rape, in the presence of Mr. Galway, a co-worker, Booker had asked the victim for a date, a request that was refused. Booker, a regular customer at the store where the victim had worked for several years, lived only one block from the grocery store and two blocks from the victim's apartment.

Other testimony also tended to place Booker near the scene of the crime. Mr. Galway worked at the grocery store during the midnight-to-9:00 a.m. shift on the night of the rape. He testified that he had talked with Booker at the store at 3:45 that morning. After a short absence, Booker returned and again talked to Galway as he washed his car during his 4:00 a.m. lunch hour. Booker was "complaining about the climate in Salt Lake, about how he was being hassled by Salt Lake City Police about raping a young white woman and how he felt that was prejudiced." Booker left the store the second time at 4:25 a.m.

Booker introduced alibi evidence. Laura Lambert, Booker's fiancee, testified that on the night of the rape Booker returned to his apartment, where Lambert was staying, at 3:15 to 3:30 a.m. and remained until 7:30 to 8:00 a.m. Miss Lambert testified that she had talked with Booker on the phone at the University Research Institute around 7:30 on the night of July 24th and had arranged a 1:30 a.m. date. This testimony was rebutted by Don Nielson, a controller at the University of Utah, who reported that there was no record of Booker's having worked that evening and that there was no entry for Booker for July 24, 1981, on the Institute's mandatory admittance log. In addition, Joe Lyons, Booker's friend, testified that on the evening of July 24th he attended two parties. Lyons ar-

rived at the second of these about 1:15 a.m., encountering Booker there and driving him home at about 3:30 a.m. on July 25th. Lyons testified that he could not remember the name of the person having the party or the address at which it was held.

Booker first contends that the evidence was insufficient to sustain his conviction. Under our cases, we will review the evidence in support of a verdict for sufficiency; however, the standard of review is narrow.

> [W]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.

*State v. Petree,* Utah, 659 P.2d 443, 444 (1983); *accord State v. McCardell,* Utah, 652 P.2d 942, 945 (1982). In reviewing the conviction, we do not substitute our judgment for that of the jury. "It is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses...." *State v. Lamm,* Utah, 606 P.2d 229, 231 (1980); *accord State v. Linden,* Utah, 657 P.2d 1364, 1366 (1983). So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops. *Cf. State v. Petree,* 659 P.2d at 447 (no evidence that the defendant "intentionally or knowingly" caused the death of the victim in prosecution for second degree murder). Applying this standard, the evidence described above and the inferences supported by it are sufficient to uphold the verdict in this case.

■ Booker next contends that his conviction rests entirely on the victim's voice identification and that under our cases, such an identification alone cannot support a conviction unless the victim can show (i) prior familiarity with the voice of the identified person or (ii) some peculiarity of the person's voice that makes it readily identifiable. Booker relies on *State v. Karas,* 43 Utah 506, 511, 136 P. 788, 790 (1913), and *State v. Kilpatrick,* 110 Utah 355, 357, 173 P.2d 284, 285 (1946). It is true that the *Karas* case, cited in *Kilpatrick,* does set out these two alternative requirements for sustaining a conviction based on a voice identification. However, Booker overlooks the fact that the *Karas* rule is limited to a situation in which the identification of the defendant by the sound of his voice is the *sole* piece of evidence tying him to the crime. Under such circumstances, a voice identification alone is considered insufficient to support a conviction unless shown to be especially reliable. *See State v. Karas,* 43 Utah at 511, 136 P. at 790; *cf.* Annot., 70 A.L.R.2d 995 (1960).

■ *Kilpatrick* shows the limits of the *Karas* rule. In *Kilpatrick,* the witness was permitted to testify that he identified the defendant by his voice, even though he had no prior familiarity with the defendant's voice and the voice had no clearly recognizable peculiarities. The conviction was affirmed because the voice identification was not the sole evidence tying the defendant to the crime. There were a number of items of circumstantial evidence that, when combined with the voice identification, provided a sufficient evidentiary basis to permit the matter to go to the jury on the question of whether the defendant was the person who committed the crime. *State v. Kilpatrick,* 110 Utah at 357, 173 P.2d at 285. In the present case, although Booker spoke with the victim at length and on several occasions, the victim neither recognized any peculiarities of speech nor was familiar with Booker's voice. As in *Kilpatrick,* however, there was ample circumstantial evidence to corroborate the voice identification and to permit the question of the rapist's identity to go to the jury. There is no basis for our disturbing the finding based on that evidence.

■ Booker next argues that the trial court committed prejudicial error by not giving a proposed instruction patterned on that required by *United States v. Telfaire,* 469 F.2d 552 (D.C.Cir.1972). This instruction would have cautioned the jury at length about considering all the circumstances surrounding an eyewitness identification before crediting it. Under our prior decisions, the giving of a *Telfaire*-type instruction has been left to the discretion of the trial courts. *State v. Newton,* Utah, 681 P.2d 833, 834 (1984); *see State v. Malmrose,* Utah, 649 P.2d 56, 61 (1982); *State v. Schaffer,* Utah, 638 P.2d 1185, 1187 (1981). We have repeatedly affirmed convictions hinging upon an eyewitness identification despite the absence of such a cautionary instruction when the trial court has adequately instructed the jury on the prosecution's burden and the jury's role. *E.g., State v. Schaffer,* 638 P.2d at 1187; *State v. Newton,* 681 P.2d at 834. In the instant case, the court's instructions adequately informed the jury of the elements of the offense, the State's burden of proof, and the jury's role in assessing the credibility of witnesses. Moreover, the jury was specifically instructed that the State bore the burden of showing, beyond a reasonable doubt, that the victim's identification of Booker was accurate and that he was the person guilty of the offense. Under these circumstances, we find no abuse of discretion in the trial court's refusal to give the requested cautionary instruction.

■ Booker makes one final claim. At trial, when Galway testified that he had talked with Booker at 3:45 and again at 4:00 on the morning of the rape, defense counsel moved for a mistrial, stating that he had not been provided with a copy of the police report describing Galway's testimony prior to trial. The court denied the motion. Booker alleges that his request for "the statutory material" covered the police report and that the prosecution's failure to provide that report constituted error. This argument fails.

Booker acknowledges that he was not entitled to a copy of the report as a federal constitutional matter, *see State v. Workman,* Utah, 635 P.2d 49, 52 (1981), but contends that disclosure of the report was required by Utah's statute governing discovery in criminal cases. That statute states in pertinent part:

> Except as otherwise provided, the prosecutor shall disclose to the defense upon request the following material or information of which he has knowledge:
>
> . . . .
>
> (5) Any ... item of evidence which the court determines on good cause shown should be made available to the defendant in order for the defendant to adequately prepare his defense.

U.C.A., 1953, § 77–35–16(a)(1) (1982 ed.). Section 77–35–16 requires the defense to make a "request" for the material. And section 77–35–12 provides that discovery requests may be made by written motion five days prior to trial. The request contemplated by section 77–35–16 and relied upon by Booker is such a "request for discovery"; therefore, the better practice would have been to make a request in writing at least five days before trial. There is, however, no indication in the record that a request under section 77–35–16, written or oral, was made at any time. Since defense counsel did not comply with section 77–35–16, we cannot entertain Booker's claim.

The conviction is affirmed.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.