STATE of Utah, Plaintiff and Appellee,

v.

Steven Troy SPAN, Defendant
and Appellant.

No. 890152.

Supreme Court of Utah.

Sept. 30, 1991.

R. Paul Van Dam, David B. Thompson, Salt Lake City, for plaintiff and appellee.

Brooke C. Wells, Elizabeth Holbrook, Salt Lake City, for defendant and appellant.

STEWART, Justice:

Steven Troy Span appeals his conviction of one count of aggravated arson, a first degree felony. Span claims the evidence was insufficient to support the conviction, the prosecutor deliberately introduced evidence which had been excluded by the trial court, and the prosecutor improperly used a peremptory challenge to remove a potential juror from the venire because of the juror's race.

## I. FACTS

Sometime between 3:15 and 3:20 a.m. on November 16, 1988, Brent Van Os and Curt Taylor drove past an apartment complex located at 2800 South Adams Street in Salt Lake and noticed a fire in a second story apartment of the complex. After Van Os and Taylor checked the affected apartment to determine if it was unoccupied and knocked on doors to warn other residents, Van Os called the fire department at 3:32 a.m. The South Salt Lake Fire Department arrived within five minutes and quickly extinguished the blaze. David Meldrum, who investigated the fire with a team of arson experts, estimated that the fire had burned in a single apartment for approximately fifteen or twenty minutes before the fire department arrived. Meldrum concluded that the fire had been intentionally set. He based his conclusion on the intensity of the fire, the burn pattern of the fire, the presence in the apartment of a pungent

odor hours after the fire, which indicated the use of an accelerant, and other peculiar factors. Meldrum excluded the possibility that the fire was accidental.

Only a few days before the fire, Barbara Lee had rented the apartment. Lee had moved her belongings into the apartment but had not stayed there before the fire. Approximately a week before she rented the apartment, Lee had terminated a four-year relationship with the defendant, Steven Troy Span, who had fathered their daughter, Falcon. Immediately after the termination of the relationship, Lee moved into her father's residence, which was near the apartment Lee and Span had shared. During the days that followed the breakup, Span broke the windshield of Lee's car twice, placed Lee's belongings on the porch of their apartment in the snow when Lee had not moved them quickly enough after the breakup, and forcibly entered Lee's father's house while Lee was present.

On November 15, the day before the fire, Lee spent a significant portion of the day with Span, their daughter, and Span's father, Alvin Span, a truck driver based in South Dakota. That night, Lee went to work as usual at approximately 6 p.m. at The Wire, a bar where she had worked for some time. Span cared for his daughter until approximately 8 p.m., when, by prearrangement, he took his daughter to Lee's father's house. Span then apparently went to The Wire to talk to Lee. The sequence of events after this is not clear; however, Span left the bar and returned at least once, and perhaps twice.

Randy Brown, a customer at The Wire who had helped Lee move her belongings into the new apartment, was also at The Wire that night. Sometime during the evening, Brown left the bar and discovered that his truck had been vandalized. Lee's car had also been vandalized. Lee and Brown returned to the bar after discovering the vandalism. A few minutes later, Span called The Wire and talked to Lee. Lee accused him of vandalizing the vehicles, but Span denied the accusation. According to Brown, Span reappeared at the bar sometime later, walked up to Brown and said, "I kicked your headlights out." At trial, Brown testified that Span then asked him if he was Lee's new boyfriend. After Brown answered in the negative and stated that he was just a friend helping Lee, Span remarked, "Well, I gave up that s—— a long time ago, anyway." Span then left the bar, but apparently sat outside until after the bar closed and watched Brown and Lee leave the establishment together. Brown and Lee testified that they went to a nearby restaurant with some other bar employees. They then went to Brown's house, where Lee spent the night because, as she testified, she was afraid of Span.

After Span observed Lee and Brown leave the bar together, Span went back to his apartment and conversed with his father. Around 3 a.m., the two left the apartment after Span packed a few of his belongings into his car. Span had decided to return to Las Vegas, where he had lived before moving to Salt Lake. Span then drove his father to his truck which was parked approximately three-quarters of a block from Span's apartment. While the truck was warming up, Span and his father talked for a few more minutes and then parted ways. The time when this parting occurred is uncertain.

Sometime between 3:45 and 4:15 a.m., Karen Bateman, a friend to both Span and Lee, was awakened by a knock at her apartment door. She answered the door and found Span, who told her that he had stopped at her apartment to say goodbye because he was going to Las Vegas. He further stated that he was upset because Lee had left the bar earlier with Brown. Finally, Span said either, "Barbara's apartment is in flames," or "I flamed Barbara's apartment." Span subsequently explained this statement by stating that he had driven by Lee's apartment and had seen the fire trucks.

Approximately a month later, Span was arrested in Las Vegas and later charged with aggravated arson. Following a jury trial, Span was convicted of aggravated arson. The trial judge sentenced Span to

an indeterminate term of imprisonment of five years to life.

## II. SUFFICIENCY OF THE EVIDENCE

On appeal, Span first contends that the evidence was insufficient to support the conviction. Specifically, he asserts that there was insufficient evidence that an arson was committed and that, even if an arson were committed, the evidence is insufficient to link him to the crime.

We review the evidence in the light most favorable to the jury verdict. *State v. Booker*, 709 P.2d 342, 345 (Utah 1985). We will reverse a jury verdict only if "the evidence ... is [so] sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Petree*, 659 P.2d 443, 444 (Utah 1983). Although the conviction in this case was based entirely on circumstantial evidence, such evidence is sufficient if it is of "such quality and quantity as to justify a jury in determining guilt beyond a reasonable doubt." *State v. Nickles*, 728 P.2d 123, 127 (Utah 1986); *see also State v. Franks*, 649 P.2d 3, 4 (Utah 1982); *State v. Clayton*, 646 P.2d 723, 724–25 (Utah 1982).

In this case, David Meldrum, the arson investigator, offered his opinion that the fire was intentionally set. Meldrum supported his opinion with specific facts concerning damage caused by the fire, the unusual burn pattern, the area of origin, the fire's intensity and short duration, the presence of a "sweet pungent smell" hours after the fire, which indicated to him the use of an accelerant, the presence of what he determined to be "pour patterns" on the floor, which also indicated the use of an accelerant, and other peculiar characteristics of the fire. Meldrum further supported his opinion by eliminating accidental causes of the fire. Under such circumstances, the jury could reasonably have concluded that arson had been committed.[1]

With respect to the identity of the perpetrator, the evidence showed that Lee and Span had terminated a four-year relationship by mutual agreement some nine days before the fire. Despite the mutuality of the dissolution, Span was upset about the breakup. After the breakup but before the fire, Span committed two acts of vandalism against Lee's automobile. Span also admitted that during this period he broke into Lee's father's house when Lee was inside to confront her. Furthermore, Span visited Lee at work several times on the evening of the 15th immediately preceding the fire. Lee described Span's demeanor as frightening. Randy Brown stated that Span admitted kicking out the headlights of his vehicle on that evening. In the early morning hours of the 16th, Span stated to both his father and Karen Bateman that he was upset because Lee had left work with Brown that evening. Finally, Span admitted to Bateman and at trial that he had driven to Lee's apartment on

---

1. Whether the fire was arson was contested at trial. Another arson investigator stated that no burn patterns were discernible to him. The criminalist for the State could not identify any volatile hydrocarbons in samples of the carpet taken from the living room of the apartment. Also, no accelerant was identified. The only evidence that the fire was caused by a criminal act was the opinion testimony of Meldrum.

Rule 704 of the Utah Rules of Evidence allows opinion evidence even if the opinion "embraces an ultimate issue to be decided by the trier of fact." The determination of whether a criminal act has been committed is "an ultimate issue to be decided by the trier of fact." Case law supports the proposition that an expert may render an opinion that certain actions constitute a crime. For example, an officer of the Bureau of Alcohol, Tobacco, and Firearms was allowed to testify that a device was a firearm subject to registration with the Bureau, *United States v. Buchanan*, 787 F.2d 477, 483–84 (10th Cir.1986); and an expert properly testified that funds were improperly taken from a corporation, *United States v. Logan*, 641 F.2d 860, 863 (10th Cir. 1981); and experts have testified that certain drugs come within a particular statutory classification, *United States v. Carroll*, 518 F.2d 187, 188 (6th Cir.1975). As long as the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," Utah R.Evid. 702, its admission is generally within the discretion of the trial court even if such testimony addresses an "ultimate issue." *But see State v. Van Matre*, 777 P.2d 459, 461–62 (Utah 1989); *State v. Rimmasch*, 775 P.2d 388, 400–07 (Utah 1989).

Adams Street sometime near the time of the fire.[2]

From this evidence, the jury could reasonably conclude that Span was angry and upset, not only because he and Lee had broken up, but also because Lee had accompanied Randy Brown to his apartment that night. The jury also could have concluded that, in a fit of anger just before he left Salt Lake, Span set fire to Lee's apartment knowing that neither Lee nor their daughter was present in the apartment. Therefore, while this case is close on the issues of whether the fire was arson and whether Span was the perpetrator of the arson, "there [was] some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime [could] reasonably be made...." *Booker*, 709 P.2d at 345. That evidence was sufficient to support Span's conviction for aggravated arson, Utah Code Ann. § 76-6-103.

## III. PROSECUTORIAL MISCONDUCT

Second, Span argues that during the course of the trial the prosecutor committed deliberate misconduct. Span claims that the prosecutor introduced evidence which had been excluded by the trial court and argues that under such circumstances, a harmless error analysis should not be entertained. Instead, Span urges that reversal of his conviction is the only appropriate remedy because of the deliberate nature of the misconduct. The State concedes that misconduct occurred, but argues that the conviction should not be reversed because Span's case was not prejudiced by the misconduct.

During the State's case in chief, the prosecutor called Grant Hodson, the owner of the apartment complex. The prosecutor intended to show that Hodson had suffered a loss because of the fire and that Hodson had no motive to burn his own property.

Defense counsel objected to this line of questioning. After the objections were sustained, a bench conference was held:

Ms. Wells [defense counsel]: Because we have a record and side-bar conferences are not placed on the record, would the court clarify that you did, in fact, make a ruling that that solicitation of testimony was irrelevant and that the objection was sustained?

The Court: Under the circumstances it was appropriate since the landlord hadn't been charged, and there may be any number of people that might be suspects. And under the circumstances, I didn't think it was material to the case, and so indicated that that would be my ruling.

Immediately after the bench conference, the prosecutor continued his direct examination of Hodson:

Q. Have you suffered as a result of that fire?

A. Excuse me, what?

Q. Yes or no. Have you suffered as a result of that fire?

A. Yes.

Q. Did you start that fire?

A. No.

Ms. Wells: Objection, your honor.

The Court: Sustained. It may be stricken. You are to disregard it.

Following this exchange, the prosecution ended its questioning of Hodson and defense counsel asked for an in-chambers conference. During the conference, defense counsel clarified the record and requested a mistrial because the prosecutor had violated the ruling issued during the bench conference. The prosecutor explained his questioning as follows:

Each and every time there's a theft or a crime where more than one person could have committed it, I submit it is relevant. And it's asked routinely about—with peo-

---

**2.** Bateman originally told fire investigators that Span had stated to her, "I flamed Barbara's apartment." At trial, Bateman stated that to the best of her recollection Span's statement was in fact, "Barbara's apartment is in flames." Furthermore, Bateman denied the accuracy of the statement made to the fire investigators. In *State v. Ramsey*, 782 P.2d 480, 484 (Utah 1989), we held that "an out-of-court statement which is denied at trial by the declarant is insufficient by itself to sustain a conviction." In this case, however, more than Bateman's disclaimed statement placed Span in the area of the fire. Bateman's testimony during the trial that Span stated "Barbara's apartment is in flames," as well as Span's own testimony, place Span at Lee's apartment near the time of the fire.

ple, "Did you commit it?" And I think that's—that is relevant. I can't see any—the court sustaining the objection. I can't see that there's any prejudice to the defendant.

Later the prosecutor attempted to explain that he did not clearly understand the court's ruling. However, the initial explanation shows that the prosecutor did understand the ruling but disagreed with it and continued to ask questions the ruling prohibited. The court concluded that striking the testimony was an adequate remedy and therefore denied the motion for a mistrial.

Span now argues that such deliberate misconduct by the prosecutor requires reversal regardless of the degree of prejudice. In making this argument, Span asserts that this Court should follow the reasoning of *State v. Ubaldi*, 190 Conn. 559, 462 A.2d 1001, *cert. denied*, 464 U.S. 916, 104 S.Ct. 280, 78 L.Ed.2d 259 (1983). In *Ubaldi*, the prosecutor stated, during closing argument, that the defendant had used city funds to pay an illegal gambling debt, evidence of which the trial court had previously ruled inadmissible. However, the trial court overruled the defendant's objection to the prosecutor's argument and allowed the prosecutor to continue without a cautionary instruction. 190 Conn. at 562–64, 462 A.2d at 1004–06. On appeal, the Supreme Court of Connecticut stated:

> The prosecutor's argument to the jury was improper both because the inference sought was clearly impermissible and because it demonstrated a complete disregard for the tribunal's rulings.... The ultimate implication of [the state's argument that reversal is required only if the misconduct could be deemed to have deprived the defendant of his constitutional right to a fair trial] is that a state's attorney may choose deliberately to ignore any trial court ruling just as long as the state has amassed overwhelming evidence of a defendant's guilt and the state's attorney's misconduct relates to only a portion of that evidence.

190 Conn. at 567–68, 462 A.2d at 1007 (footnotes omitted). The court held that the "only feasible deterrent to flagrant prosecutorial misconduct in defiance of a trial court ruling" was reversal of the criminal conviction. 190 Conn. at 571, 462 A.2d at 1009. In reaching this holding, however, the court considered the prejudicial effect of the prosecutor's actions:

> Where a prosecutor in argument interjects remarks deliberately intended to undermine the rulings of a trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal.

190 Conn. at 575, 462 A.2d at 1011.

Here, the State concedes that the prosecutor violated the court's order restricting the scope of the prosecutor's examination of Hodson. The State argues, however, that the issue was waived by defense counsel's questioning of Hodson on the same subject matter, the defendant was not prejudiced by the prosecutor's misconduct, and other actions short of reversal would be sufficient to prevent such misconduct.

■ The State's first argument, that the defendant waived the issue by cross-examining Hodson on the same material, is meritless. Objections to the prosecutor's misconduct and a motion for a mistrial were made before the defense cross-examined Hodson. It would be unfair for a prosecutor to question a witness on prohibited information or issues, but then require the defendant to forego cross-examination, which could ameliorate the damage caused, to preserve an objection to the prosecutor's misconduct. *See State v. Ireland*, 773 P.2d 1375, 1378 (Utah 1989). *See generally* M. Graham, *Handbook of Federal Evidence* § 103.4, at 19 (3d ed. 1991).

■ *Ubaldi*, insofar as it eliminates a prejudice requirement, is contrary to the approach traditionally followed by this Court. In *State v. Troy*, 688 P.2d 483 (Utah 1984), the prosecutor committed intentional misconduct in opening statement by referring to the defendant's alias and to his being a federal witness; in questioning by asking defendant's former attorney about the defendant's being involved in "various criminal matters;" and in closing

argument by comparing defendant to "criminals [who] have all kinds of irrational behavior." 688 P.2d at 485–86. In deciding whether the prosecutor's misconduct deprived defendant of a fair trial, the Court applied a two-step prejudice test. This test examines first whether the prosecutor has called the jury's attention to matters the jury would not be justified in considering, and second, whether, under the circumstances of the particular case, there was a probability that the jurors were influenced by the prosecutor's remarks. 688 P.2d at 486 (citing *State v. Valdez*, 30 Utah 2d 54, 60, 513 P.2d 422, 426 (1973)).

Finding the first step clearly met, the Court considered the second step, explaining:

> Step two is more difficult and involves a consideration of the circumstances of the case as a whole. In making such a consideration, it is appropriate to look at the evidence of defendant's guilt.
>
> "If proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial." *State v. Seeger*, 4 Or.App. 336, 479 P.2d 240 (1971). Likewise, in a case with less compelling proof, this Court will closely scrutinize the conduct. If the conclusion of the jurors is based on their weighing conflicting evidence or evidence susceptible of differing interpretations, there is a greater likelihood that they will be improperly influenced through remarks of counsel.... [In such cases, the jurors] may be especially susceptible to influence, and a small degree of influence may be sufficient to affect the verdict.

688 P.2d at 486. The *Troy* Court concluded that because there was no compelling proof of the defendant's guilt, the jury could have found either way. Thus, the jurors probably were influenced by the prosecutor's remarks, and the second step of the test was met. 688 P.2d at 487.

■ Applying the *Troy* test to the conduct at issue here, we hold that reversal is not warranted. Under step one, the prosecutor clearly was calling the jury's attention to matters outside the evidence by questioning the landlord about his loss and motive. Under step two, although the jury may have been unduly influenced by the prosecutorial misconduct, the misconduct in this case was not directed at the defendant, as it was in *Troy. See also State v. Wiswell*, 639 P.2d 146 (Utah 1981). Rather, the prosecutor's violation of the trial court's ruling was directed at the elimination of another individual as a suspect in the arson. The jurors, in their own minds, would probably have conducted this evaluation anyway. Thus, the impact of the prosecutor's misconduct was qualitatively different from that encountered in *Troy*. Additionally, the trial judge instructed the jury to disregard the objectionable material. In sum, the prejudice to Span was negligible, and we cannot say that the outcome of the trial was affected.

In declining to reverse on this issue, we do not condone the prosecutor's conduct in this case. We agree with the *Ubaldi* court that a state's attorney may not deliberately choose to ignore a trial court's ruling. *See Ubaldi*, 190 Conn. at 567–68, 462 A.2d at 1007. Indeed, we are aware that a mere appellate rebuke ignores the reality of the adversary system of justice. Under similar circumstances, another jurist has stated:

> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the [prosecutor] here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, "Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of 'disapproved' remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial." Government coun-

sel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice [of verbal criticism without judicial action]—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary. *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 661 (2d Cir.) (Frank, J., dissenting), *cert. denied*, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946); *see also United States v. Bivona*, 487 F.2d 443, 447 (2d Cir.1973) (citing Frank, J., with approval).

■ The State's brief concedes, "The prosecutor did violate the court's order restricting the scope of the prosecutor's examination of Mr. Hodson." As noted previously, the prosecutor's initial explanation of his conduct did not involve any misunderstanding of the trial court's ruling, but rather an expression of disbelief that the trial court's ruling could be correct. The State suggests that using either the contempt powers of the trial court or the disciplinary powers of the state bar is appropriate in such cases. Even in instances where the misconduct is prejudicial and results in reversal, the prosecutor's conduct should be independently reviewed. We therefore remand this case for a hearing in the trial court to determine whether it should impose any disciplinary action for the deliberate violation of its order or whether the prosecutor should be referred to the State Bar for disciplinary action.[3]

## IV. RACIALLY MOTIVATED PEREMPTORY CHALLENGE

Finally, Span contends that the prosecutor used a racially motivated peremptory challenge to remove the only minority juror from the venire. Before the jury was sworn, Span moved to "quash the jury," alleging that the prosecutor had exercised

his final peremptory challenge based on the race of the juror removed. The defendant's counsel cited *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *State v. Cantu*, 750 P.2d 591 (Utah 1988), in making the challenge.

The prospective juror in question was Mr. Viet Phung. Mr. Phung is a naturalized citizen who had apparently been born in Vietnam, although that fact was never established at trial. Mr. Phung stated that he worked at a supermarket chain, was married and had three children, and that he had graduated from high school in Vietnam. The only question asked of Mr. Phung was by the trial court concerning how long he had been a citizen of the United States, to which Mr. Phung responded "approximately nine years." Mr. Phung was asked no other questions and did not give any indication that he could not be a fair and objective juror. Mr. Phung was the last venireman stricken by the prosecutor.

In response to Span's motion to quash, the prosecutor attempted to explain his peremptory challenge by describing the general method that he used to pick jurors. Then, the prosecutor stated:

> It has nothing to do with his—in fact, I didn't even think about a study that says they are more likely to be [more favorably disposed toward the defendant]—I think perhaps he has been around long enough, and perhaps I can speculate. He's been through enough, having come from Viet Nam, that I think that the study would be different with Mr. Phung.

> But he was just one I had a question about initially, and so he ended up being the one that I—had to take someone off, and I took him. It was not directed at him as a minority.

> It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

---

**3.** Rule 3.4(c) of the Utah Rules of Professional Conduct (1988) states, "A lawyer shall not ... knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists...." Furthermore, standard 3–5.6(b) of the *A.B.A. Standards for Criminal Justice,* the Prosecution Function (1979), states:

The prosecutor's unarticulated "question" about Mr. Phung's competence as a juror arose despite the fact that the prosecutor asked no questions of Mr. Phung.

The trial court denied Span's motion to quash the panel on two grounds. First, the trial court ruled that the issue had not been timely presented. Second, the trial court stated that the defendant had to be a member of a cognizable minority group to raise such a challenge.

On appeal, the State concedes that the trial court's first basis for denying Span's motion, that the motion was not timely, was erroneous. The motion was made immediately after the peremptory challenges to the jurors were completed and before the jury was sworn. The State notes that the defendant's citation to Utah Code Ann. § 78–46–16 (Supp.1990) and Rule 18 of the Utah Rules of Criminal Procedure, Utah Code Ann. § 77–35–18 (1982) (repealed effective July 1, 1990), supports the position that the motion was timely. *See, e.g., State v. Bankhead,* 727 P.2d 216, 217 (Utah 1986) (§ 78–46–16(1) requires that any challenge to the jury must be lodged before the jury is sworn).

### A. *Standing to Raise a* Batson-*type Challenge*

■ The real issue here concerns Span's argument that the trial judge erroneously ruled that a defendant must be a member of a cognizable minority group before he may raise a *Batson*-type challenge.[4] A review of *Batson,* as well as case law before and after it, is necessary to a complete understanding of the problem.

Prior to *Batson,* the issue of discriminatory peremptory challenges was controlled by *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain,* the United States Supreme Court recog-

nized that a "State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." 380 U.S. at 203–04, 85 S.Ct. at 826–27. The Court, however, also sought to accommodate the prosecutor's historical right to use peremptory challenges without judicial control. The *Swain* Court thus refused to scrutinize a prosecutor's action in an individual case. 380 U.S. at 221–22, 85 S.Ct. at 836–37. Rather, the Court stated that a defendant could demonstrate a prima facie case of purposeful discrimination if he showed that a prosecutor

> in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries....

380 U.S. at 223, 85 S.Ct. at 837. Therefore, under *Swain,* a defendant was required to demonstrate continual systematic removal of minorities from venires to prevail on an equal protection challenge.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court removed the requirement that a defendant demonstrate systematic discrimination. In *Batson,* the Court recognized, "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." 476 U.S. at 87, 106 S.Ct. at 1718. Since the decision in *Swain,* the Court had "recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selec-

---

4. On appeal, Span argues that the prosecutor's discriminatory use of a peremptory challenge violated his rights under the fourteenth amendment equal protection analysis of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the due process analysis of *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), and the sixth amendment fair cross-section/impartial jury analysis found in other case law. However, in the trial court, Span raised only the *Batson/Cantu* challenge. Therefore, we address only the equal protection issue. Whatever rights may have been affected under the due process clause or the sixth amendment fair cross-section/impartial jury analysis must await proper presentation by a defendant in a trial court. *See infra* note 5.

tion of the venire by relying solely on the facts concerning its selection *in his case.*" 476 U.S. at 95, 106 S.Ct. at 1722 (emphasis in original). Based on this change and underlying concerns about racial discrimination in any given case, the Court removed the impediment imposed by *Swain.* The Court stated:

> These principles support our conclusion that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery v. Georgia,* 345 U.S. [559] at 562, 97 L.Ed. 1244, 73 S.Ct. 891 [at 892 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
>
> ....
>
> Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's ex-

planation need not rise to the level justifying exercise of a challenge for cause. But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.

476 U.S. at 96–97, 106 S.Ct. at 1723–24 (citations omitted).

*Batson* allowed an individual defendant to attack the allegedly discriminatory peremptory challenges of a prosecutor in a particular case. However, the *Batson* court stated that "the defendant first must show that he is a member of a cognizable racial group" and that the removed veniremen are "members of the defendant's race." 476 U.S. at 96, 106 S.Ct. at 1723. On its face, *Batson* appears to impose a standing requirement which prohibits a defendant of a race different from the stricken venireman from raising an equal protection challenge.

In *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), a majority of the Court held that while a white defendant has standing to raise a sixth amendment fair cross-section/impartial jury challenge to the prosecutor's peremptory removal of Afro–Americans from his jury, the sixth amendment's fair cross-section requirement cannot be interpreted to prohibit discriminatory peremptory challenges.[5] However, five members of the Court, Justices Kennedy, Marshall, Brennan, Blackmun and Stevens, stated that a defendant situated in the same position as Holland (i.e., a white defendant challenging the exclusion of minorities from the jury) would also have standing under the fourteenth amendment equal protection clause to raise a claim of discriminatory peremptory challenges (i.e., a *Batson*-type claim).[6]

In *Powers v. Ohio,* —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Unit-

---

**5.** *Holland v. Illinois* also controls Span's challenge based on the federal sixth amendment right to a fair cross-section/impartial jury and decides the issue against Span.

**6.** The Utah Court of Appeals recently relied on the expressed majority in *Holland v. Illinois* to hold that a "different race" defendant had standing to raise a *Batson*-type challenge. *See State v. Harrison,* 805 P.2d 769, 774–75 (Utah Ct.App. 1991).

ed States Supreme Court held that a defendant may raise a *Batson*-type equal protection challenge to the allegedly discriminatory use of a peremptory challenge without regard to the sameness of the race of the defendant and the excluded prospective juror. Justice Kennedy, writing for the majority, stated:

> If the defendant has no right to object to the prosecutor's improper exclusion of jurors, and if the trial court has no duty to make a prompt inquiry when the defendant shows, by adequate grounds, a likelihood of impropriety in the exercise of a challenge, there arises legitimate doubts that the jury has been chosen by proper means. The composition of the trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow.
>
> . . . .
>
> ... To bar [a defendant's] claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service.

111 S.Ct. at 1371–73. The majority further stated that *Batson*'s emphasis on racial identity between the defendant and the excluded prospective juror was not inconsistent. The Court explained:

> Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima

facie case and a conclusive showing that wrongful discrimination has occurred.

111 S.Ct. at 1373–74. *Powers* clearly eliminated any standing requirement which *Batson* imposed and held that a defendant of any race may challenge the discriminatory use of peremptory challenges on equal protection grounds.[7]

This Court has not considered the standing issue in either of its two previous *Batson*-type cases. In *State v. Cantu*, 750 P.2d 591 (Utah 1988) ("*Cantu I*"), the Court stated verbatim the *Batson* criteria for establishing a prima facie case. The first criterion was not an impediment to the standing of the defendant to raise a *Batson* challenge, however, because the defendant was a member of the same racial group as the excluded juror. In *Cantu I*, a majority of the Court concluded that the defendant had established a prima facie case of discriminatory use of the peremptory challenge, and on that basis, the case was remanded to the district court to determine whether the exercise of the peremptory challenge violated the defendant's right to equal protection under *Batson*. 750 P.2d at 597. Subsequently, in *State v. Cantu*, 778 P.2d 517 (Utah 1989) ("*Cantu II*"), which involved the same defendant, this Court held that the prosecutor's motivation in exercising the peremptory challenge, as determined by his explanation after remand, was indirectly related to the juror's race. The Court held that the prosecutor's challenge was racially motivated, and the case was remanded for a new trial. 778 P.2d at 518–19.

---

**7.** Before *Powers*, the apparent standing requirement of *Batson* had been criticized by courts and scholars. For example, in *State v. Superior Court (Maricopa County)*, 156 Ariz. 512, 753 P.2d 1168 (Ct.App.1987) *aff'd*, 157 Ariz. 541, 760 P.2d 541 (1988), *cert. denied*, —— U.S. ——, 111 S.Ct. 1638, 113 L.Ed. 2d 733 (1991), the Arizona Court of Appeals held that a defendant had standing to challenge the prosecutor's use of discriminatory peremptory challenges. The court stated: "In our opinion, the 'same class' language of *Batson*, goes not to the issue of standing (right to use the issue), but is directed only toward the establishment of a *prima facie* evidentiary case of purposeful discrimination." 156 Ariz. at 515, 753 P.2d at 1171; *see also* Alschuler, *The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts*, 56 U.Chi.L.Rev. 153, 191–92 (1989); Meyer & Sparer, *Batson and the Discriminatory Use of Peremptory Challenges*, in *Jurywork, Systematic Techniques* 4–18 to 4–19 (Krauss & Benora eds. 2d ed. 1989) ("[T]here is language in the *Batson* opinion which is inconsistent with the standing limitation it imposes."); Note, *Sixth Amendment Reform of Peremptory Challenges—State v. Superior Court, 157 Ariz. 541, 760 P.2d 541 (1988) (en banc)*, 21 Ariz.St.L.J. 327 (1989); Note, *Due Process Limits on Prosecutorial Peremptory Challenges*, 102 Harv.L.Rev. 1013 (1989); Note, *The Case for Abolishing Peremptory Challenges in Criminal Trials*, 21 Harv.C.R.—C.L.L.Rev. 227 (1986); Note, *Affirmative Selection: A New Response to Peremptory Challenge Abuse*, 38 Stan. L.Rev. 781 (1986).

Discriminatory peremptory challenges harm the individual criminal defendant and the juror who is the subject of discrimination, and they are an affront to the judicial system. Despite the longstanding tradition of restricting judicial interference in the exercise of peremptory challenges, the judiciary cannot be a party to the discriminatory use of the challenge. The discriminatory peremptory challenge of a minority juror simply because a prosecutor believes that the juror's race may influence the juror's decision in the case is offensive regardless of the defendant's race. The assumption that a minority juror cannot fairly hear a case because of his or her race or ethnic origin simply has no place in the American system of justice. Such an assumption is antithetical to the equal protection clause of the United States Constitution. Based on our analysis of the issue and *Powers*, we hold that no standing requirement exists which requires the defendant to be of the same race as the challenged juror. Therefore, the trial court was in error when it concluded that Span must be of the same race as the stricken juror in order to raise a *Batson*-type challenge.

### B. Cognizability of a Minority Group

Because the trial judge ruled that the motion was not only untimely but failed because of the defendant's race, an important issue was not reached by the trial court: whether Mr. Phung belongs to a cognizable minority group. Because such a finding is necessary to establish a prima facie case of discrimination, we remand to the trial court on this issue.

The State asserts that our previous cases on the issue of cognizability, *Cantu I* and *Cantu II*, have resulted in "ambiguity" which "requires clarification." Because of the nature of the issues on remand and because *Cantu I* and *Cantu II* may have created confusion on the issue, we take this opportunity to define what constitutes a cognizable minority group. Under any legitimate theory asserted by a defendant that a prosecutor has unconstitutionally discriminated in the use of a peremptory challenge, a defendant must demonstrate that the excluded prospective juror was a member of a cognizable minority group. *See Holland*, 110 S.Ct. at 805; *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723; *State v. Tillman*, 750 P.2d 546, 575 (Utah 1987) ("A prima facie violation of the fair cross-section guarantee is established where a defendant shows: ... 'that the group alleged to be excluded is a "distinctive" group in the community....' " (citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)).

Although "courts have pointedly disagreed upon the proper standard to apply in determining cognizability under *Batson* and have struggled repeatedly in deciding whether a particular classification satisfies the cognizability standards," Note, *Due Process Limits on Prosecutorial Peremptory Challenges*, 102 Harv.L.Rev. 1013, 1020 (1989), some evidence is required that the excluded juror is a member of a cognizable minority group. The cognizability of a particular group may, in fact, be different depending on the context in which a challenge is made. In *Tillman*, this Court stated that one component of establishing a prima facie violation of the fair cross-section guarantee of the sixth amendment in selecting the *jury venire* is "that the group alleged to be excluded is a 'distinctive' group in the community." *Tillman*, 750 P.2d at 575 (citing *Duren v. Missouri*, 439 U.S. at 364, 99 S.Ct. at 668). The Court then stated:

Although [the defendant] claimed that all racial and ethnic minorities were excluded from Salt Lake County venires, defendants focus on appeal upon Hispanics. [The defendant] contends that Hispanics are distinctive because they are designated in a separate category in census figures and because they are "segregated by religion, economic status and cultural background from the majority of county residents." Similarly, the State would have us assume that Hispanics are a distinctive group for fair cross-section purposes. We believe such an assumption is too hastily made. *For purposes of the equal protection clause, Hispan-*

*ics may be a distinctive group.* But it does not necessarily follow that they are distinctive in Salt Lake County for fair cross-section purposes.

750 P.2d at 575 (footnotes and citations omitted, emphasis added). *Cantu I* recognized the cognizability of Hispanics in Salt Lake County in cases of discriminatory peremptory challenges, which suggests that cognizability is context-specific.

The requirements for proving a cognizable group with respect to the selection of a jury venire and peremptory challenges do appear to be different. When confronted directly with the question in the *Batson* context, the Court in *Cantu I,* stated, "Hispanics or Spanish-surnamed persons are a 'cognizable racial group' for purposes of equal protection analysis under *Batson*." *Cantu I,* 750 P.2d at 596 (footnote omitted) (citing *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Fields v. People,* 732 P.2d 1145 (Colo.1987)). However, the *Fields* case, cited in *Cantu I,* specifically adopted the sixth amendment fair cross-section standard for determining cognizability that the California Supreme Court set forth in *People v. Wheeler,* 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890 (1978). In *Wheeler,* the court held that "a group is legally cognizable if it is defined on the basis of race, national origin, religion or sex." 732 P.2d at 1153–54 & n. 15. *Cantu I*'s reliance on *Fields* for its conclusion that "Hispanics or Spanish-surnamed persons are a 'cognizable racial group' for equal protection analysis under *Batson*" is not consistent with a footnote in *Cantu I,* where the Court "reserve[d] judgment on whether Hispanics are a distinctive group under sixth amendment fair cross-section analysis." 750 P.2d at 596 n. 3 (citing *State v. Tillman,* 750 P.2d 546 (Utah 1987)). Moreover, the Court's *Cantu II* citation to the elements of a prima facie case of group bias as those enunciated in *People v. Wheeler*—which include "a showing that persons excluded belong to a cognizable group under the representative cross-section rule"—compounds the problem and requires clarification. *See Cantu II,* 778 P.2d at 518.

The conflict between equal protection and fair cross-section standards of cognizability is brought into sharp focus in *United States v. Biaggi,* 673 F.Supp. 96 (E.D.N.Y.1987), *aff'd,* 853 F.2d 89 (2d Cir. 1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). There, the court stated:

In order to satisfy the first prong of the *Batson* three-part test, it must be shown that Italian–Americans constitute a "cognizable racial group." The standard for determining cognizability for equal protection objections to peremptory challenges during jury selection under *Batson* is the one set out in *Castaneda v. Partida,* as is clear from the *Batson* Court's direct citation to *Castaneda.* This standard defines as cognizable any group that is "a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1274.

The government urges that, instead of following *Castaneda,* the Court should adopt the reasoning of the First Circuit in *United States v. Sgro,* 816 F.2d 30 (1st Cir.1987), which found the evidence insufficient to establish that Italian–Americans are a "cognizable racial group" under *Batson.* There the First Circuit chose to borrow the cognizability standard developed for the Sixth Amendment requirement that the jury venire represent a fair cross-section of the population. *See Sgro,* 816 F.2d at 33 (employing the characteristics outlined in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Barber v. Ponte,* 772 F.2d 982, 997 (1st Cir.1985) (en banc)). The *Sgro* court's borrowing act is initially suspect because the Supreme Court in *Batson* quite clearly commanded that *Castaneda* govern its own use of the term "cognizable racial group." *See Batson,* 106 S.Ct. at 1723.

Furthermore, there is an important difference between the meaning of cognizability in these two different contexts. Discrimination against a group in the cross-section of the venire, in violation of the Sixth Amendment, may be demon-

strated by mere statistical underrepresentation of that group. *See Duren*, 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. Discrimination in the use of peremptory challenges in violation of the equal protection clause, by contrast, necessitates a showing of the "essential element" of "discriminatory purpose." *Id.; see Batson*, 106 S.Ct. at 1723–24. Because discrimination in the venire under the Sixth Amendment may be statistical, the definition of a "cognizable group" must be narrowly drawn lest any group imaginable by defense counsel be found numerically underrepresented. *See Barber*, 772 F.2d at 999 (en banc) (warning that "blue-collar workers, yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications" could receive protection).

*Because the guarantee against discrimination through peremptory challenges requires a showing of purpose, "cognizable racial groups" may be defined less rigidly, for it is precisely the evidence of intentional exclusion of the group that helps to identify the group.* The First Circuit itself made this distinction clear:

> That is not to say, however, that if a classification were *specifically* and *systematically* excluded from jury duty the same standard would be used as here, where defendant simply relies on a statistical disparity in the venires to challenge its constitutionality [under the fair cross-section rule]. If certain people are specifically and systematically excluded from jury duty, then the jury-administrating authority would have created its own group.

*Barber*, 772 F.2d at 999–1000 (en banc) (emphasis in original).

673 F.Supp. at 99–100 (citations omitted, emphasis added except as indicated).

 *Biaggi* illustrates the difficulties created by the absence of a clear standard for determining cognizability. Here, the State concedes that for a *Batson*/equal protection analysis, the *Biaggi* court is correct in concluding that the standard set forth in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), which is specifically cited in *Batson* and is less restrictive, is more appropriately applied than is the test of *Duren*. The *Duren* test, which analyzes the distinctiveness of the group within the community, is appropriate when a challenge is being made to the selection of the venire from which the petit jury is chosen. *See Redd v. Negley*, 785 P.2d 1098, 1100 (Utah 1989); *State v. Tillman*, 750 P.2d 546, 575 (Utah 1987). However, the *Castaneda–Biaggi* test, which focuses on the intentional exclusion of an individual on the basis of membership in a group, is more appropriate to the *Batson* peremptory challenge case. In such a case, it is the prosecutor's perception that a member of a particular group will not as favorably receive his case as a member of another group which defines the prejudice of the discriminatory challenge. Therefore, it is the discrimination against a specified group which helps define the group. If the prosecutor peremptorily strikes a juror simply because of a perception that the juror's race or ethnic origin will make a difference in the juror's weighing of the case, that is sufficient to meet the *Batson* and *Cantu* criteria to establish a cognizable group.

## C. Evaluation of the Prosecutor's Explanation

Because the trial court based its ruling on timeliness and the defendant's race, another issue was not reached: whether the prosecutor's challenge was race-neutral.

In *Cantu II*, we adopted the criteria of *State v. Slappy*, 522 So.2d 18 (Fla.1988), to be used when a court evaluates a prosecutor's explanation of his allegedly racially motivated peremptory challenge. *Slappy*'s list of factors "that may cast doubt upon the legitimacy of a purportedly race-neutral explanation" because they "tend to show that the state's reasons are not actually supported by the record or are an impermissible pretext" include:

> (1) alleged group bias not shown to be shared by the juror in question, (2) failure to examine the juror or perfunctory examination, assuming neither the trial court nor opposing counsel had questioned the juror, (3) singling the juror out

for special questioning designed to evoke a certain response, (4) the prosecutor's reason is unrelated to the facts of the case, and (5) a challenge based on reasons equally applicable to juror[s] who were not challenged.

*Cantu II,* 778 P.2d at 518–19 (citing *Slappy,* 522 So.2d at 22). In this case, the prosecutor referred to Mr. Phung's country of origin in explaining the reason for the challenge, asked no questions of Mr. Phung during voir dire, and articulated only a vague reason not related to the facts of the case for striking Mr. Phung. From this it is difficult to determine whether or not the prosecutor's reason for striking Mr. Phung was race-neutral. Furthermore, the trial court did not rule on this issue, and the State has not argued for the race-neutrality of the prosecutor's strike as a basis for affirming the trial court. Therefore, if the trial court determines on remand that Mr. Phung is indeed a member of a cognizable group, then the next step would be to determine the basis for the prosecutor's challenge of Mr. Phung. *See Cantu I,* 750 P.2d at 597 (Utah 1988).

In sum, we hold that the evidence was sufficient to sustain the conviction against Span; that the prosecutorial misconduct, though deliberate and subject to evaluation on remand, did not prejudice Span's case; and that the trial court's bases for refusing to hear Span's challenge to the jury selection were erroneous. On remand, the trial court should determine if Mr. Phung is a member of a cognizable group as we have defined it and, if he is, evaluate whether the prosecutor's challenge was race-neutral.

Affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.

HALL, C.J., and DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Associate C.J., concurs in parts I, II, III, IV.A, and IV.C and in the result of part IV.B.