**STATE of Utah, Plaintiff and Appellee,**

v.

**Frank E. PHARRIS, Defendant and Appellant.**

**No. 910279–CA.**

Court of Appeals of Utah.

Jan. 15, 1993.

Eric P. Swenson (argued), Monticello, for defendant and appellant.

Jan Graham, State Atty. Gen., Christine F. Soltis (argued), Salt Lake City, for plaintiff and appellee.

Before BILLINGS, GREENWOOD and ORME, JJ.

## OPINION

GREENWOOD, Judge:

■ Defendant Frank E. Pharris appeals the jury verdict finding him guilty of injury to a jail in violation of Utah Code Annotated section 76–8–418 (1990). On appeal, defendant contends that (1) the State violated his constitutional rights by improperly using peremptory challenges to prevent Native Americans from being impaneled on the jury deciding his case, (2) the statute under which he was charged is unconstitutionally vague, and (3) the trial court erred in refusing to instruct the jury on the lesser included offense of criminal mischief, Utah Code Annotated section 76–6–106 (1990).[1] We reverse in part and affirm in part.

## BACKGROUND

Defendant was an inmate in the San Juan County Jail on November 22, 1990, when he and a fellow prisoner created a destructive disturbance in the jail. During that afternoon, because defendant and co-defendant[2] had become intoxicated, jail officials placed each of them in isolation. Just before 6:00 p.m., a guard heard defendant either jumping or banging on his bunk. When he looked into defendant's cell, the guard saw him repeatedly flushing a clogged toilet, causing gallons of water to pour out on the floor. Defendant was yelling, ranting, and making obscene gestures.

The guard called for assistance and turned off the water to defendant's cell. He then noticed that water was pouring down from co-defendant's isolation cell directly above the cell occupied by defendant. The water from the two toilets combined to flood both the cell and the day room outside the cell with between one-half and three-fourths inches of water. When the guards returned from shutting off the water to co-defendant's cell, defendant was banging his fist against the light fixture in his cell, displacing, but not breaking its bracket. Upon removing defendant from the cell, the guards discovered that the welds holding up the bunk were broken. After the fifteen minute incident, defendant's cell was unusable, a welder had to repair the bunk, a painter had to repaint the wall, and maintenance had to remove about eighty-five gallons of water from the carpet of the day room.

The water seeped into the basement where it soaked the jail's backup generator, causing it to smoke. Testimony about damage to the generator was conflicting. At the preliminary hearing, the officer in charge of the jail during the incident testified that the generator was in working order after the incident. At trial, however, the maintenance man who inspected and worked on the generator testified that the generator had to be turned off to dry and that the next day he discovered that the generator's automatic clock had broken. He testified that turning off the generator for repair left the jail without backup power for twenty-four hours.

As a result of this incident, both defendant and co-defendant were charged and later convicted of a felony, injuring a jail. On appeal, defendant does not dispute the facts so much as he challenges the procedure allowing these facts to become a basis for his conviction.

1. Defendant raises additional issues on appeal which we do not address. See Low v. Bonacci, 788 P.2d 512, 513 (Utah 1990). Among those issues, defendant challenges the trial court's refusal to allow use of a preliminary hearing transcript for an unavailable witness. Although we conclude that, under the circumstances, the exclusion was error, we find the error harmless because "it is unlikely that the excluded testimony prejudiced the defendant's rights in a substantial manner." State v. Rammel, 721 P.2d 498, 500 (Utah 1986).

2. Defendant and the fellow prisoner were tried together as codefendants.

Both during the trial and on appeal, defendant challenged the prosecutor's use of peremptory strikes to prevent Native Americans from serving on the jury which would hear his case. After the trial court removed several potential jurors from the venire for cause, five of the remaining potential jurors were Native Americans. The prosecutor questioned two of those Native Americans during voir dire about possible familial relationships with individuals recently prosecuted by the County Attorney's office. The first, Ms. Bedonie, related that she was a close family friend of the person about whom she was asked, but also stated that she could put this relationship aside to decide the case before her. The second, Ms. Gray, stated that she did not know the individual named by the prosecutor although he did have her same married name and came from the same general vicinity of the state as she. The prosecutor then used the first three of his four peremptory challenges to strike Native Americans, including the two women questioned during voir dire. The jury that was later impaneled included the two remaining Native Americans among its eight members.

Near the end of the jury selection process and before the trial court impaneled the jury, both defendant's and co-defendant's attorneys requested that the prosecutor provide race neutral explanations for challenging the Native Americans. The trial court overruled defendants' objection to the petit jury, stating that the prosecutor "need not respond in any fashion to the inference or challenges." The prosecutor, however, immediately stated that he was willing to go on the record with regard to two of the challenges he had made. He explained that he based the challenges of

both Ms. Gray and Ms. Bedonie on his suspicion, aroused during earlier questioning, that they might be related to individuals that his department had prosecuted. When defendant's counsel asked for an explanation for the prosecutor's challenge of the third Native American, the court foreclosed further discussion on the matter.

Defendant renewed his objections in a motion to arrest the judgment following defendant's conviction, at which time he submitted an affidavit providing statistics contrasting the 43.57% Native American population of the county with the 25% Native Americans impaneled in the jury. When the trial court denied defendant's motion to arrest the judgment, defendant appealed.

## DISCRIMINATION IN JURY SELECTION

On constitutional grounds, defendant challenges the selection process through which the jury was impaneled. Defendant claims that the trial court erred in refusing to require the prosecutor to defend his peremptory challenges of Native Americans.[3] The State counters this challenge by contending that the trial court's insistence that the prosecution need not respond to defendant's challenge was an implicit ruling that defendant had not made out the necessary prima facie case of discrimination. The State asserts that the proper issue before this court is whether defendant had established a prima facie case "such that the State should be compelled to respond to rebut the presumption." While we agree with the State's statement of this issue, we disagree with both its analysis of the trial court's re-

3. Defendant originally phrased his claim of error in terms of the court's failure to require the prosecutor to provide race neutral explanations for his use of preemptive challenges because the challenges resulted in a trial panel that did not reflect a fair cross section of San Juan County.

This claim of error demonstrates confusion between an equal protection challenge based upon *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and a Sixth Amendment challenge based on *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990). The Sixth Amendment as interpreted by the

Supreme Court guarantees that a venire must represent a fair cross section of the community. *Holland*, 493 U.S. at 482–83, 110 S.Ct. at 808–09. It does not, however, guarantee that a particular trial jury will reflect a cross section of the distinctive groups in the community. *Id.* Equal protection, on the other hand, guarantees that a prosecutor may not exercise peremptory challenges to remove a juror because of that person's race. *Batson* 476 U.S. at 89, 106 S.Ct. at 1719. Therefore, we analyze defendant's claim as an alleged equal protection violation.

sponse and with the trial court's conclusion.

## Standard of Review

 The trial court's conclusion as to whether or not a prima facie case was established is a legal determination which we review for correctness, according it no particular deference. *See State v. Crowder,* 114 Utah 202, 197 P.2d 917, 921 (1948); *Roosevelt City v. Nebeker,* 815 P.2d 738, 740 (Utah App.1991). The factual findings of the trial court relevant to allegedly discriminatory peremptory challenges merit deference on appeal and will be set aside only if they are clearly erroneous. *State v. Cantu,* 778 P.2d 517, 518 (Utah 1989) (*Cantu II*); *State v. Harrison,* 805 P.2d 769, 778 (Utah App.), *cert. denied,* 817 P.2d 327 (Utah 1991). This court, however, will review the sufficiency of the trial court's findings of fact for correctness. *See State v. Ramirez,* 817 P.2d 774, 782 (Utah 1991). If the trial court fails to make adequate findings on the issue of discrimination in peremptory challenges after appropriate objection, the appeals court must remand the case to the trial court for further proceedings. *See Batson v. Kentucky,* 476 U.S. 79, 100, 106 S.Ct. 1712, 1725, 90 L.Ed.2d 69 (1986); *State v. Cantu,* 750 P.2d 591, 597 (Utah 1988) (*Cantu I*).

## Inapplicability of Harmless Error Analysis

 Both parties in this case agree that if the State's peremptory challenges were purposefully discriminatory, defendant's conviction must be reversed without regard to the harmlessness of the constitutional error. This stipulation is consistent with the directive in *Batson* that if a court finds unrebutted, purposeful discrimination, "precedents require that [a] petitioner's conviction be reversed." *Batson,* 476 U.S. at 100, 106 S.Ct. at 1725. Although the Supreme Court did not expressly negate the applicability of harmless error analysis in the *Batson* text, Justice Blackmun stated, in a concurrence in a later opinion, that *Batson* exemplified one of the categories of constitutional error to which the Supreme Court has refused to apply a harmless error analysis. *Dawson v. Delaware,*

—— U.S. ——, 112 S.Ct. 1093, 1099, 117 L.Ed.2d 309 (1992) (Blackmun J., concurring). Justice Blackmun's statement is consistent with language in *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), in which the Court discussed "the constitutional right to an impartial jury" and the importance of the impartial adjudicator "to the very integrity of the legal system." *Gray,* 481 U.S. at 668, 107 S.Ct. at 2057 (negating harmless error analysis in reviewing exclusion for cause of an otherwise qualified juror because of opposition to the death penalty). "We have recognized that 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' The right to an impartial adjudicator, be it judge or jury, is such a right." *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)). Considering *Batson* in light of this language persuades us that a harmless error analysis is inappropriate for reviewing allegations of discrimination in jury selection, despite contrary language in Utah cases. *See Cantu I,* 750 P.2d at 597; *Harrison,* 805 P.2d at 780 (both holding that a "harmless beyond a reasonable doubt" standard is applicable).

## Role of the Trial Court

This court recognizes a long standing judicial commitment to eradicating discrimination in the jury selection process. *See Strauder v. Kentucky,* 100 U.S. 303, 312, 25 L.Ed. 664 (1880). This commitment stems from a recognition of the importance of the jury as a "quintessential governmental body—indeed, the institution of government on which our judicial system depends." *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 2356, 120 L.Ed.2d 33 (1992). For this reason, the United States Supreme Court has concluded that racial discrimination in the selection of the jury harms defendants, excluded jury panel members, and the entire community by undermining the belief that verdicts are rendered "in accordance with the law by persons who are fair." *McCollum,* —— U.S. at ——, 112 S.Ct. at 2353. Defendants are

entitled to the safeguard of a jury composed of their peers or equals, and they have the right "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85–86, 106 S.Ct. at 1717. Because a "person's race simply 'is unrelated to his fitness as a juror,'" veniremen have a right not to be excluded from jury participation on account of their race. *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718 (quoting *Theil v. Southern Pacific Co.*, 328 U.S. 217, 223–24, 66 S.Ct. 984, 987–88, 90 L.Ed. 1181 (1946)). Furthermore, "public confidence in the fairness of our system of justice" depends on the public's right to jury selection procedures that do not purposefully exclude members of any distinct racial group. *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718.

Because the Supreme Court has interpreted the equal protection clause of the Fourteenth Amendment as guaranteeing defendants a trial before a jury selected through a nondiscriminatory process, the Court has required careful monitoring of the various stages of the process by which the trial court impanels a petit jury. *See Batson*, 476 U.S. at 87–89, 106 S.Ct. at 1718–19. The *Batson* court specifically noted that a state's right to use peremptory challenges "ultimately is subject to the strictures of equal protection." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. In assessing the constitutionality of peremptory challenges, appellate courts have focused on eliminating purposeful discrimination. *Batson*, 476 U.S. at 90, 106 S.Ct. at 1719.

The *Batson* Court recognized that "peremptory challenges constitute a jury selec-

tion practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)). To minimize this potential for deliberate racial discrimination, the Court has increasingly limited the discretion of parties exercising peremptory challenges. Parties may not challenge potential jurors based either on an assumption that a particular racial group is unqualified to serve on a jury or on an assumption that certain distinct racial groups are incapable of impartial consideration of the State's case against a member of their racial group. *Batson*, 476 U.S. at 89, 106 S.Ct. at 1719. Tolerating the exclusion of jurors on either basis would make the core guarantee of equal protection meaningless. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.[4]

■ The *Batson* Court noted that the enforcement of this equal protection guarantee poses difficult evidentiary problems for the party alleging discrimination. *Batson*, 476 U.S. at 92, 106 S.Ct. at 1721. The *Batson* Court, therefore, revised an existing, overly burdensome test for determining whether discrimination motivated the peremptory challenges in a particular case.[5] *Batson*, 476 U.S. at 90–95, 106 S.Ct. at 1720–22. The revised test required the trial court to evaluate allegations of discrimination according to a three step analytical process involving (1) an assessment of the facts supporting the discrimination allegation to determine if they are sufficient for a prima facie case; (2) a shift of the evidentiary burden to the prosecution

4. The Court has, therefore, expanded the limitations on peremptory challenges first imposed on the prosecution in criminal cases, *Batson*, 476 U.S. at 100, 106 S.Ct. at 1725, to include both parties in civil litigation, *Edmonson v. Leesville Concrete Co.*, 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and, most recently, the defendant in criminal cases, *McCollum*, —— U.S. ——, 112 S.Ct. 2348.

5. The *Batson* Court expressly revised the test for analyzing allegations of discrimination developed in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *Batson*, 476 U.S. at 92, 106 S.Ct. at 1721. The *Batson* Court found that the insurmountable evidentiary burden that

the earlier test placed on the defendant effectively immunized prosecutors' peremptory challenges from constitutional scrutiny. *Batson*, 476 U.S. at 92–93, 106 S.Ct. at 1721. That Court, therefore, revised the burden placed on a defendant alleging improper discrimination in peremptory challenges. Instead of requiring a defendant to show systematic exclusion of a group of jurors in case after case, the Court allowed defendant to prove discrimination based solely on facts related to his or her own case. *Batson*, 476 U.S. at 96, 100 n. 25, 106 S.Ct. at 1723, 1725 n. 25 (overruling any part of *Swain*, 380 U.S. 202, 85 S.Ct. 824, which held to the contrary).

to rebut the inference of discrimination, if a prima facie showing is made; and (3) an evaluation of all presented facts to determine whether the jury selection involved purposeful discrimination. *Batson*, 476 U.S. at 96–100, 106 S.Ct. at 1723–25.

In setting out this analytical framework, the *Batson* Court declined to formulate specific procedures which a trial court must follow in responding to a defendant's timely objection to a prosecutor's peremptory challenges. *Batson*, 476 U.S. at 99, 106 S.Ct. at 1724–25 and n. 24. The *Batson* Court, however, stated certain principles to serve as guidelines for trial courts. First, the Court intended that its new analytical framework should remove a crippling burden of proof from the defendant. *Batson*, 476 U.S. at 92, 106 S.Ct. at 1721. Second, the Court intended its *Batson* decision to close potential loopholes in jury selection procedures not already specifically protected by decisional law. *Batson*, 476 U.S. at 88, 106 S.Ct. at 1718. These principles dictate that trial courts utilize a method of factual evaluation which alleviates undue burdens of proof and which focuses on exposing any illegal discrimination. The *Batson* Court also required that trial courts "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93, 106 S.Ct. at 1721 (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977)).

Subsequent Court decisions support the *Batson* Court's delegation of responsibility to the trial court to develop techniques by which to evaluate discrimination allegations: "It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice." *Powers v. Ohio*, 499 U.S. ——, 111 S.Ct. 1364, 1374, 113 L.Ed.2d 411 (1991).

Post-*Batson* Supreme Court decisions have also emphasized the importance of the trial court's duty of careful evaluation. The *Powers* Court expressed the theory underlying this responsibility: "[I]f the trial court has no duty to make a prompt inquiry ... [t]he composition of the trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow." *Powers*, 499 U.S. at ——, 111 S.Ct. at 1371–72. The *Edmonson* Court further warned that "[b]y enforcing a discriminatory peremptory challenge," the court " 'not only ma[kes] itself a party to the [biased act], but has elected to place its power, property and prestige behind the [alleged] discrimination.' " *Edmonson v. Leesville Concrete Co.*, 500 U.S. ——, 111 S.Ct. 2077, 2085, 114 L.Ed.2d 660 (1991) (quoting *Burton v. Wilmington Parking Author.*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)). Most recently the Court stated that "if a court allows jurors to be excluded because of group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens' confidence in it." *McCollum*, —— U.S. at ——, 112 S.Ct. at 2354.

■ Viewing the *Batson* analytical framework in light of these directives indicates that the role of the trial courts is pivotal in the overall effort to eliminate racial discrimination in the jury selection process. By taking an active role in assessing objections to peremptory challenges, the trial court can arrest such discrimination at the earliest possible juncture. After making appropriate determinations, the trial court must record sufficient findings of fact to allow a reviewing court to follow its analysis regarding the challenges.

In the case before this court, the trial court's cursory treatment of defendant's challenge of the prosecution's peremptory strikes against Native Americans did not live up to the Supreme Court's standard. The trial court did not conduct a sensitive inquiry; it did not follow the outlined three step procedure for analysis of a discrimination allegation; its findings of fact were incomplete; and it misstated the law in its justifications for dismissing defendant's objections. For these reasons, this court reverses the trial court's decision finding no

impropriety in the prosecution's peremptory challenges.

### The Prima Facie Case

Because of the importance of preventing racial discrimination in jury selection, state and federal appellate courts have developed criteria for trial courts to use in assessing the prima facie element of the *Batson* analytical process. *See State v. Span*, 819 P.2d 329, 342 (Utah 1991); *State v. Cantu I*, 750 P.2d 591, 595 (Utah 1988); *United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir.1987). In this case, after examining the record, we find sufficient facts to satisfy, as a matter of law, the requirements for a prima facie case.

■ Defendant argued that his mere assertion of discrimination combined with the under-representation of Native Americans on the trial panel shifted the burden to the State and required the trial court to demand and evaluate the State's explanation.[6] Preliminarily, this court recognizes that although the *Batson* holding authorized defendants to inquire into the State's good faith in the use of its peremptory challenges, a mere assertion of impropriety does not trigger the court's responsibility to conduct a *Batson* inquiry. *State v. Harrison*, 805 P.2d 769, 777 (Utah App.), *cert. denied*, 817 P.2d 327 (Utah 1991). Ordinarily, prosecutors have the freedom to base peremptory challenges on any reasons related to their views of the outcome of the case about to be tried. *Batson*, 476 U.S. at 89, 106 S.Ct. at 1719. Therefore, standing alone, a challenge to a venireperson who belongs to a minority group does not raise an inference of discrimination. *Cantu I*, 750 P.2d at 597. "It is not unconstitutional without more, to strike one or more [minority members] from the jury." *Id.* (quoting

*Batson*, 476 U.S. at 79, 106 S.Ct. at 1725 (White, J., concurring)).

To compel a *Batson* inquiry, the challenging party must instead make out a prima facie case by presenting facts adequate to raise an inference of improper discrimination. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723; *Cantu I*, 750 P.2d at 596. The *Batson* decision identifies several specific factors raising an inference of discrimination. Some of these factors have been modified by later state and Supreme Court decisions. For example, while a defendant must have standing under the Fourteenth Amendment to challenge the peremptory strikes of the prosecution, *State v. Span*, 819 P.2d 329, 338 (Utah 1991), he or she no longer needs to establish membership in the racial group that the prosecution struck with its peremptory challenges. *Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991); *Harrison*, 805 P.2d at 775.

■ In determining whether discrimination against a distinctive group has occurred, trial courts should consider disproportionate impact as circumstantial evidence of invidious intent. *Batson*, 476 U.S. at 93, 106 S.Ct. at 1721. Although some jurisdictions now recognize a prima facie case based only on statistical evidence of disproportionate impact,[7] Utah has not addressed the argument that statistics alone are sufficient to make out a prima facie case. Instead, the Utah Supreme Court described a prima facie test that requires a substantially complete record, a showing that the challenged jurors belonged to a recognized group, and strong likelihood that the challenge was based on group association rather than specific bias. *State v. Cantu*, 778 P.2d 517, 518 (Utah 1989) (*Cantu II*). Utah's standard for a distinct

---

**6.** Defendant generally argued to the trial court that the prosecutor's peremptory challenges were racially discriminatory and resulted in a panel which under-represented Native Americans. In his Memorandum accompanying the Motion to Arrest Judgment, defendant specifically asserted that the prosecutor's use of 75% of his peremptory challenges to remove Native Americans was sufficient to establish a prima facie case of improper discrimination.

**7.** On remand from the Supreme Court, the Second Circuit held that statistical disparities as to the number of challenges directed toward minority jurors provided a standard for finding a prima facie case of purposeful discrimination. *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir.1991) (finding a prima facie case of discrimination where 50% of the state's challenges struck minorities).

group, consistent with the *Batson* decision, "defines as cognizable any group that is 'a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.' " *Span,* 819 P.2d at 341 (quoting *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1274, 51 L.Ed.2d 498 (1977)).

██ In the instant case, the prosecutor exercised peremptory challenges against Native Americans in the first three of his four challenges. For purposes of *Batson* analysis, this court takes judicial notice of the fact that Native Americans constitute a distinctive group in this region. *See Redd v. Negley,* 785 P.2d 1098, 1104 (Utah 1989) (Durham, J., dissenting) (citing *United States v. Chalen,* 812 F.2d 1302, 1314 (10th Cir.1987) which held that Native Americans constitute a "cognizable racial group"). Accordingly, we hold that Native Americans meet the *Span* and *Castaneda* standard for a cognizable racial group in this state. Although defendant, a white male, is not himself a Native American, the injury resulting from possible discrimination in the jury selection affords him standing to present an equal protection challenge.[8] *See Span,* 819 P.2d at 338; *Harrison,* 805 P.2d at 775 (authorizing third party standing to challenge the exclusion of members of a cognizable group from the jury).

██ In the case before this court, defendant generally asserted that these peremptory challenges were racially discriminatory and created a panel under-representing Native Americans. He specifically noted that the prosecutor used three of his four peremptory strikes (75%) to exclude Native Americans from the panel and offered statistics demonstrating that the racial composition of the petit jury changed significantly from that of the initial jury pool. Defendant also pointed out that the prosecutor conducted no voir dire questioning at all of one of the excluded Native Americans. We conclude that these indicia

of racial discrimination, when viewed cumulatively, satisfy the criteria of a prima facie case of racial discrimination in the selection of the jury in defendant's case.

### The Race Neutral Explanation

██ Because defendant made out a prima facie case, the trial court should have recognized that the burden of proof shifted to the prosecutor to provide race-neutral justifications for his actions. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. These explanations must fit within parameters defined by the *Batson* Court to successfully rebut an allegation of discrimination. Although the explanation "need not rise to the level justifying exercise of a challenge for cause," a party may not rebut the prima facie case by either asserting that he or she believed that the challenged venireman would be partial to the defendant because of race or by simply denying any lack of good faith in the challenged peremptory strikes. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723–24. Instead, the party exercising the challenge must explain, in a *clear,* reasonably *specific* manner, *legitimate, neutral* reasons for his or her challenges that are related to the specific case about to be tried. *Batson,* 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20.

██ Utah has adopted additional criteria by which to judge the adequacy of a party's explanation of an allegedly racially motivated peremptory challenge. The trial court must discount justifications if the prospective juror was (1) not shown to share an alleged bias, (2) not examined or subjected only to perfunctory examination by the prosecutor when neither the trial court nor the defense had questioned him or her, (3) singled out for questioning to evoke a specific response, (4) challenged for a reason unrelated to the trial, or (5) challenged for reasons equally applicable to other jurors not similarly challenged.

---

8. Utah appellate courts have already reviewed a case from this same county involving an allegation of discrimination against Native Americans in the jury selection process. *Redd,* 785 P.2d at 1101 (rejecting a Sixth Amendment challenge for failure to present sufficient evidence). In

that case, Justice Zimmerman, in concurrence, stated "if there are relatively few Native Americans on the venires in San Juan County, that fact would certainly raise serious constitutional questions." *Id.* at 1102 (Zimmerman, J., concurring).

*Span*, 819 P.2d at 342–43; *see also Cantu II,* 778 P.2d at 518 (approving the criteria of *State v. Slappy,* 522 So.2d 18 (Fla.1988), *cert. denied,* 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988)). These factors operate as guidelines to determine " 'the legitimacy of a purportedly race-neutral explanation,' " by focusing the court's evaluation on whether the record supports the explanations or whether those explanations are an impermissible pretext for discrimination. *Span,* 819 P.2d at 342 (quoting *Cantu II,* 778 P.2d at 518–19).

◼ In this case, although the trial court summarily dismissed the allegations of discrimination, the prosecution voluntarily provided explanations for two of its three peremptory challenges exercised against Native Americans.[9] The prosecutor explained that he had removed those Native Americans because he suspected they might be related to individuals that his office had prosecuted. The trial court should have evaluated these statements according to the *Batson* criteria and the Utah Supreme Court's factors, but did not.

The record also shows that the prosecution did not question the third Native American dismissed by a peremptory strike at all. Post–*Batson* cases have indicated that the improper dismissal of even one venireman is intolerable. *See Span,* 819 P.2d at 336; *Cantu I,* 750 P.2d at 597; *Chalan,* 812 F.2d at 1314. The prosecution must, therefore, adequately explain each of the challenged peremptory strikes. By foreclosing defendant's request for an explanation of all three peremptory strikes, the trial court impermissibly allowed the prosecution to avoid the necessity of providing race-neutral explanations for each of his challenged actions.

### Determination by the Trial Court

◼ It is the trial court which must determine if a defendant has established that purposeful discrimination tainted the jury selection process. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. In making this decision, the trial court must consider its duty to actively participate in the overall effort to eliminate racial discrimination by making a sensitive inquiry into all the facts and circumstances pertinent to the discrimination allegation. *Harrison,* 805 P.2d at 778.

To promote comprehensive analysis, trial courts must allow defendants an opportunity to attack the justifications offered by the prosecution for striking prospective jurors. *Id.* Defendant asserted that the prosecutor's explanation for challenging the first prospective juror did not adequately indicate bias relevant to the instant case. He implied that the explanation for the second juror was pretextual by stating that it was based simply on the juror's having the same last name and coming from the same broad general area as a formerly prosecuted individual whom she denied knowing. Defendant also noted that the prosecutor questioned only two of the three stricken Native Americans during the voir dire and explained only those two challenges. To determine whether defendant proved improper discrimination, the trial court should also have considered these responses to the prosecution's rebuttal.

Because of the necessity of evaluating the discrimination issue according to specific analytical guidelines, the trial court must create a complete record. The trial court in this case, however, merely recorded incomplete, conclusory statements in its findings of fact on defendant's motion to arrest the judgment. Any lack of record or trial court failure to rule on the issue of race-neutrality creates difficulty in assessing the adequacy of the prosecutor's explanations on appeal. *See Span,* 819 P.2d at 343.

The inadequacy of the findings is exemplified by the trial court's failure to record its evaluation of credibility. Utah has recognized that the trial court's determination of the discrimination issue may turn on its assessment of the credibility of the party

---

**9.** Although we found that the record in this case satisfies the elements of a prima facie case, this court has previously held that if a prosecutor fails to contest the adequacy of the prima facie case and instead attempts to rebut the accusation of discrimination, the adequacy of the prima facie case becomes a moot issue and the court must reach the ultimate issue of whether improper discrimination actually occurred. *Harrison,* 805 P.2d at 777.

defending the peremptory challenge. *Harrison*, 805 P.2d at 778; *Cantu II*, 778 P.2d at 518. However, before an appellate court can offer proper deference to trial court determinations based on credibility, the trial court must make appropriate findings.

The findings in this case not only inadequately addressed essential factual issues, but also misstated applicable law. The trial court's seventh finding of fact inaccurately distinguished *Batson* stating that it was "not controlling on the facts in this case in that the defendant herein was not a Native American." This distinction is immaterial in light of post-*Batson* cases which conclusively hold that a defendant need not share the same racial background as the jury members stricken by peremptory challenges. *Powers*, —— U.S. at ——, 111 S.Ct. at 1373. The trial court also stated that not all challenges removed minorities and noted that some minority members remained on the jury panel. However, because "a single challenge based on race is impermissible," *Cantu I*, 750 P.2d at 597, neither fact is dispositive of the issue of discrimination in the removal of other jurors.

Having determined that the trial court's stated factual and legal bases for overruling defendant's objections to the jury selection were either insufficient or erroneous, we remand this case to the trial court for an evidentiary hearing on the race-neutrality of the prosecution's challenges of all three prospective jurors. The *Batson* directive to remand a case in which the trial court flatly rejects a defendant's discrimination allegation, *Batson*, 476 U.S. at 100, 106 S.Ct. at 1725, applies equally to cases in which the trial court insufficiently assesses the facts or law relevant to the challenge. We further require the trial court to record sufficient findings of fact and conclusions on all the evidence relevant to its decision, to facilitate appellate review. If, on remand, the trial court determines that racial discrimination motivated any of the prosecutor's peremptory challenges, it must reverse defendant's conviction and retry his case. *Batson*, 476 U.S. at 100, 106 S.Ct. at 1725.

## INJURY TO A JAIL

■ Defendant also claims that the trial court erred in failing to dismiss the information against him because the "injury to a jail" statute providing the basis for the charge against him is unconstitutional. That statute, codified as Utah Code Annotated Section 76-8-418 (1990), reads:

> Every person who wilfully and intentionally breaks down, pulls down, or otherwise destroys or injures any public jail or other place of confinement is guilty of a felony of the third degree.

Defendant asserts that the statute (1) is unconstitutionally vague in violation of the due process guarantees of the Fifth and Fourteenth Amendments to the United States Constitution, and the similar provisions of Article I, Sections 7 and 12 in the Utah Constitution, and (2) unfairly classifies him by segregating prisoners from the general public in violation of defendant's right to equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Utah Constitution. We review the trial court's decision on the constitutionality of the statute for correctness, according no deference to its legal conclusions. *State v. James*, 819 P.2d 781, 796 (Utah 1991); *City of Monticello v. Christensen*, 788 P.2d 513, 516 (Utah), *cert. denied*, 498 U.S. 841, 111 S.Ct. 120, 112 L.Ed.2d 89 (1990).

■ Generally, we presume the constitutionality of a statute, and defendant, as challenger, has the burden to demonstrate its unconstitutionality. *Greenwood v. City of North Salt Lake*, 817 P.2d 816, 819 (Utah 1991). We, therefore, apply this presumption of deference to legislative determinations designating penal sanctions. *See State v. Davis*, 787 P.2d 517, 519 (Utah App.1990); *State v. Archambeau*, 820 P.2d 920, 927 (Utah App.1991). As hereafter explained, we determine the statute to be constitutional.

### Vagueness

■ Defendant argues that this court should invalidate the "injury to a jail" stat-

ute under the due process void-for-vagueness doctrine. That doctrine requires a statute to define an " 'offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " *Greenwood v. City of North Salt Lake*, 817 P.2d 816, 819 (Utah 1991) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). If an enactment does not clearly define its prohibitions and, even more importantly, establish minimal guidelines for its enforcement, it violates due process. *Id.; Archambeau*, 820 P.2d 920, 927 (Utah App. 1991).

■ Defendant relies upon this due process doctrine for his argument that the statute is invalid both on its face and as applied to the facts of his case. However, because we find that the statute is valid as applied to the facts of defendant's case, we do not address defendant's challenge of the facial validity of the statute. Facial invalidity can only be found if a statute is " 'incapable of any valid application.' " *Greenwood*, 817 P.2d at 819 (quoting *Steffel v. Thompson*, 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974)); *Archambeau*, 820 P.2d at 927.

■ Defendant's as-applied due process challenge fails because he does not prove either that the statute did not provide him adequate notice or that the statute contained no meaningful standards to guide those enforcing the law. Defendant's broad argument that the statute lacks sufficient specificity in defining the acts and resultant damage which can invoke the sanctions of the law can be reduced to a specific claim that the statute did not provide him fair warning that breaking the cell bunk weld and damaging the power generator by flooding the jail cell could result in felony sanctions. However, we find that these acts and the resulting damages fall within the scope of the statute because

they caused injury to portions of the jail facility that are essential to its functioning.

This conclusion comports with the reasoning of *State v. Jaimez*, 817 P.2d 822 (Utah App.1991). Although that decision did not address the constitutionality of the "injury to a jail" statute, it did interpret the plain meaning of the statute's language in a manner consistent with our disposition of defendant's argument that the statute should be limited to felony prosecution of "substantial damage." As recognized in *Jaimez*, the statutory language includes "any damage to the facility" within the plain meaning of "injury." [10] *Id.* at 827. This broad interpretation of the word "injury" negates defendant's claim that the statute failed to give him fair warning that his actions could result in a felony conviction.

We also rule against defendant's claim that the statute should fail for allowing enforcement officials unfettered discretion in imposing sanctions. Defendant's disagreement with the broad interpretation of the statute's language does not translate into a lack of meaningful standards to guide the application of the statute. The statute sets the standard that any injury to a physical facility used for jail functions can be punished under the statute. *Id.* at 826.

This directive focuses jail officials on protecting the jail facility. Although defendant argued that the jail staff appeared to be reacting to the prisoners' vulgar speech and refusal to obey jail rules, these behavioral problems are immaterial to the imposition of charges under the statute. Thus, based upon *Jaimez*, we conclude that the State properly charged defendant for the damage he inflicted to the bunk bed in the solitary confinement cell and the generator in the basement area.

### Equal Protection

■ This court also disagrees with defendant's contention that the "injury to a jail" statute violates his right to equal pro-

---

**10.** The decision construed the "injury to a jail" statute "according to the fair import of its terms" as required by Utah Code Annotated section 76–1–106 (1990), and interpreted it accord-

ing to the rule of construction focusing on "plain meaning." *Id.* at 826 (discussing *State v. Jones*, 735 P.2d 399, 402 (Utah App.1987)).

tection by impermissibly punishing jail inmates and prisoners to a greater degree than others. Although defendant based this claim on both the equal protection clause of the Fourteenth Amendment of the United States Constitution and Article I, section 24 of the Utah Constitution, his arguments do not distinguish between these two bases for his claims. Utah courts, however, have recognized that while both provisions " 'embody the same principle: persons similarly situated should be treated similarly,' " they have different contexts and jurisprudential considerations. *Greenwood v. City of North Salt Lake,* 817 P.2d 816, 820 (Utah 1991) (quoting *Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984)). Under the federal constitutional test, equal protection in instances involving no suspect class or fundamental right, guarantees only that the classification created by the statute must be "rationally related to a valid public purpose." *Id.* at 820–21. The state test, on the other hand, operates more restrictively than the federal test, requiring that "a law must apply equally to all persons within a class and that statutory classifications must have a reasonable tendency to further the objectives of the statute." *Id.* at 821.

We conclude that the statute challenged in this case satisfies both tests. It applies equally to the entire class of persons who cause injury to a jail in that it authorizes the state to sanction either a member of the general public or an inmate of a prison in the same manner for causing the same type of damage. Because punishing this class of persons has a reasonable tendency to further the statute's objective of fully protecting the facilities essential to the functioning of a jail, the statute is constitutional.

Instructions on Lesser Included Offenses

Defendant asserts that the trial court improperly instructed the jury by refusing defendant's requested instructions on the lesser included offense of criminal mischief, under Utah Code Annotated section 76–6–106 (1990).[11] Because a trial court's decision to refuse a jury instruction presents a question of law, we review that decision for correctness without affording it any particular deference. *State v. Jaimez,* 817 P.2d 822, 826 (Utah App.1991); *State v. Singh,* 819 P.2d 356, 360 (Utah App.1991), *cert. denied,* 832 P.2d 476 (Utah 1992).

Utah applies a "two-tier 'evidence-based standard' " to determine whether a trial court should give a requested instructions. *Singh,* 819 P.2d at 360 (quoting *State v. Baker,* 671 P.2d 152, 159 (Utah 1983)).

> Under that standard, two conditions must be satisfied before a trial court is required to give the requested instruction: (1) the statutory elements of the offense charged must overlap with those of the included offenses; and (2) the evidence adduced at trial must provide a rational basis for a verdict acquitting defendant of the offense charged and convicting him or her of the included offense.

*Id.* Utah has previously applied this standard to contested instructions involving the same two statutes at issue in this case. *See Jaimez,* 817 P.2d at 827. In *Jaimez,* the court concluded that although the offenses of injury to a jail and criminal mischief are related, because *any* damage amounted to injury to the jail, a jury would have no rational basis to acquit a defendant of the jail injury offense and at the same time convict him of the lesser included offense of criminal mischief. *Id.*

Defendant argues that the analysis in *Jaimez* is not controlling in his case because (1) *Jaimez* did not consider whether the injury to a jail statute was void for vagueness and (2) the specific area injured by defendant's actions, the basement area housing the courthouse generator, is not a part of the jail. Defendant fails to persuade us with either of these arguments. We decided earlier that the statute is not void for vagueness and now hold that the section of the basement housing the gener-

---

**11.** That statute provides that a person commits criminal mischief if "[h]e intentionally damages, defaces, or destroys the property of another." Utah Code Ann. § 76–6–106(1)(c) (1990).

ator is part of the jail for purposes of this statute.[12]

The *Jaimez* court's interpretation of the scope of the noun "jail" is critical to our decision. That court had to determine whether the "jail" had been injured when Jaimez's act of flooding his cell damaged the ceiling, insulation and light fixtures in the squad room below the cell. *Id.* at 824. The court noted that, in addition to its other functions, the squad room was used for housing and processing inmates. *Id.* at 827. Because the room was "used for jail purposes", the court deemed it part of the jail for purposes of the "injury to a jail" statute. *Id.*

By defining "jail" in terms of an area which is used to some extent, for jail purposes, the *Jaimez* opinion provides the authority for us to conclude that the section of the basement used to house the generator is part of the jail. By analogy to the area used for processing inmates, the space housing the machinery providing back up electricity for the jail's electronic security system, is "used" for an essential jail function. Damaging either the site for prisoner processing or the site providing power to insure jail security could significantly compromise the safe functioning of a jail.

Furthermore, we agree with the *Jaimez* decision that the difference between the focuses of the two statutes precludes the jury from acquitting defendant of injury to a jail and still convicting him of criminal mischief. Because of the imperative that a jail function properly, the injury to a jail statute focuses on protecting all essential parts of the jail facility. By contrast, the criminal mischief statute focuses on penalizing a person damaging the property of others according to the value of the damage inflicted. *See* Utah Code Ann. § 76–6–106(2)(c). This valuation concept is immaterial in the context of protecting the functioning of a jail. While costly damage could have minimal impact on the safe functioning of the facility, minimal damage to critical parts of the physical facilities could have disastrous consequences. For this reason, we conclude that protecting each essential part of the facility without regard to the cost of repairing it is rationally related to the goal of inmate and public safety. We, therefore, determine that the trial court did not err in refusing defendant's requested lesser included instruction.

## CONCLUSION

Defendant met the requirements of a prima facie case of racial discrimination in the State's use of peremptory challenges during jury selection. The trial court erred in its failure to properly evaluate defendant's allegation of discrimination. We, therefore, remand this case for an evidentiary hearing during which the trial court must require the State to rebut each inference of discriminatory peremptory challenge.

If, on remand, the trial court determines that the jury selection process was infected with deliberate discrimination, it must retry defendant's case. If retrial is necessary, the parties may proceed knowing that the "injury to a jail" statute is constitutional and the lesser included instruction on criminal mischief is not warranted.

BILLINGS and ORME, JJ., concur.

---

**12.** This holding is consistent with the trial court's instruction defining a "public jail" as including "plumbing and electrical material and fixtures attached thereto."